UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| SUSAN S. AMOS, M.D., | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| *vs.* | ) No. 2:15-cv-00414-JMS-MJD |
| | ) |
| VIGO COUNTY COUNCIL, and VIGO COUNTY | ) |
| TREASURER JIM BRAMBLE, *in his official capac-* | ) |
| *ity*, | ) |
| | ) |
| *Defendants*. | ) |

## ORDER

Plaintiff Susan Amos, M.D., is a female physician who was elected Coroner of Vigo County, Indiana in November 2012.  Her predecessor as Coroner, Dr. Ronald Kohr, is a male physician specializing in pathology who performed autopsies in Vigo County without charging the County fees in addition to his Coroner salary.  Prior to his retirement in 2012, Dr. Kohr advised Defendant the Vigo County Council (the "Council") that because he would no longer be performing autopsies free of charge (since he would no longer be the Coroner), Vigo County would need to budget an additional $50,000 for autopsies to pay either to him or to other individuals that would perform autopsies after his retirement.  Additionally, certain property tax caps enacted by the Indiana General Assembly had reduced the County's tax revenue and thus affected its overall budget.  Vigo County also determined that it was paying its Coroner significantly more than the average salary of coroners in comparably sized counties.  Because of the necessity of adding $50,000 to the budget to account for Dr. Kohr's free autopsy services, implementation of the property tax cap, and the realization that the Vigo County coroner was being paid more than other counties' coroners, the Council adopted a budget in the fall of 2012 that reduced the coroner's base salary from

$45,579 (Dr. Kohr's salary) to $21,270.  Dr. Amos ran unopposed for Coroner in the 2012 election, and took office on January 1, 2013.

Dr. Amos initiated this litigation in December 2015, claiming that the Council and Defendant Vigo County Treasurer Jim Bramble, in his official capacity, discriminated against her based on her gender by reducing the Coroner salary.  Presently pending before the Court is a Motion for Summary Judgment filed by Vigo County and Mr. Bramble.  [Filing No. 35.]

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In

other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### STATEMENT OF FACTS

The following statement of facts was evaluated pursuant to the standards set forth above, that is, they are either undisputed[1] or presented in the light most favorable to Dr. Amos: [2]

### A.  The Vigo County Coroner Position

The Vigo County Coroner position is a publicly elected office with a four year term.  Ind. Const. Art. 6, § 2(a).  Duties of the Coroner include: "1. IDENTIFICATION of the deceased; 2. Determination of the CAUSE of death; and 3. Determination of the MANNER of death."

---

[1] The Court notes that Dr. Amos lists only three "material facts in dispute" in her response brief: "(1) whether Dr. Amos (female) and her immediate predecessor as Vigo County Coroner, Dr. Roland Kohr (male), are similarly situated; (2) whether Vigo County's stated justifications for the differential treatment between Dr. Amos and Dr. Kohr are pretextual; and (3) whether Vigo County discriminated on the basis of Dr. Amos' gender in setting her pay."  [Filing No. 41 at 3.]  These are legal conclusions, not facts, indicating that Dr. Amos does not dispute any of the facts Defendants set forth in their "Statement of Material Facts Not in Dispute," [Filing No. 36 at 3-11].

[2] The Court's Practices and Procedures clearly set forth in Appendix A how to cite to exhibits in a brief.  [Filing No. 42.]  The parties have not followed the Court's clear instruction, instead referring to exhibits by name or number, and citing to their actual page or paragraph numbers instead of their ECF page numbers.  For example, Dr. Amos cited to material in paragraphs 4-7 of the Affidavit of Donna Weger as "Ex. 26, Affidavit of Donna Weger, ¶¶ 4-7."  [See Filing No. 41 at 4.] Instead, the citation should be "Filing No. 41-16 at 2-3," which corresponds to the ECF number of the document, and the ECF page number where the cited testimony appears.  Further complicating the Court's ability to locate the Weger Affidavit is the fact that while Dr. Amos refers to the document as "Ex. 26," it is attachment 16 to Dr. Amos' response brief.  Similarly, Defendants have not followed the Court's Practices and Procedures, and refer to the exhibit name rather than the ECF number of the document.  For example, Defendants cite to material on page 7 of excerpts from Dr. Amos' deposition as "Amos depo., 7:5-7."  [Filing No. 36 at 3.]  This citation should be "Filing No. 35-1 at 4," which denotes the ECF number of the document, and the ECF page number where the cited testimony appears.  Further complicating the Court's ability to locate this exhibit is the fact that Defendants did not label their exhibits by name, but only numbered them Exhibits 1 through 12.  Accordingly, the Court was required to open and review each exhibit to determine what it was.  The parties' failure to provide the form of citation the Court has specifically set forth in its Practices and Procedures made the Court's review of the pending motion unnecessarily cumbersome.  Counsel are cautioned to comply with the Court's Practices and Procedures going forward in this and other cases.

http://www.vigocounty.in.gov/department/index.php?strustured=5 (last visited March 7, 2017).  A

Vigo County Coroner may not serve more than two consecutive terms.  Ind. Const. Art. 6, § 2(c).

The Council is responsible for setting the salary for publicly elected Vigo County officials, includ-

ing the Coroner.  [Filing No. 41-18 at 4.]  Since 1989, the Vigo County Coroner has been either

Dr. Kohr or Dr. Amos.  [Filing No. 41-16 at 2-3.]

### B.  Dr. Kohr's Initial Terms As Coroner

Dr. Kohr is a medical doctor specializing in pathology.  [Filing No. 35-1 at 12.]  He served

two terms as Coroner from 1989 to 1996, where he received a salary equal to other elected officials

in Vigo County including the Assessor, Auditor, Clerk, Recorder, Surveyor, and Treasurer.  [Filing

No. 41-16 at 2.]   Because Dr. Kohr was limited to serving two consecutive terms as Coroner, he

spoke with Dr. Amos about running for Coroner when his term was up.  [Filing No. 41-17 at 18-

19.]  In 1996, Dr. Kohr hired Dr. Amos as a deputy Coroner so that she would "get more of a feel

for the office" before she ran for Coroner.  [Filing No. 41-17 at 19.]

### C.  Dr. Amos' Initial Terms As Coroner

Dr. Amos won the election in 1996, and served as Coroner from 1997 to 2004.  [Filing No.

41-16 at 2.]  During that time, she received a salary equal to the salaries of the Vigo County As-

sessor, Auditor, Clerk, Recorder, Surveyor, and Treasurer.  [Filing No. 41-16 at 2.]

### D.  Dr. Kohr's Second Terms as Coroner

Following Dr. Amos' initial two consecutive terms, Dr. Kohr served as Coroner again from

2005 to 2012.  [Filing No. 41-16 at 3.]  While serving as Coroner during this time, Dr. Kohr per-

formed autopsies required by the Coroner's office without charging professional fees in excess of

the salary authorized for the Coroner position by the Council.  [Filing No. 35-9 at 2.]  Dr. Amos

- 5 -

was aware that Dr. Kohr was performing autopsies without assessing any professional fee for those services.  [Filing No. 35-1 at 13-14.]

### E.  Salary for Dr. Kohr's Successor

#### 1.  Budget Increase for Autopsies

In 2012, as Dr. Kohr's second two consecutive terms were coming to an end, Dr. Kohr reminded members of the Council that he would be retiring as Coroner at the end of the year and would no longer be performing autopsies as part of his Coroner duties.  [Filing No. 35-9 at 2; *see also* Filing No. 35-12 at 5 (agenda for Council's June 18, 2012 Annual Budget Committee meeting stating "Autopsy Fees – Dr. Kohr will no longer be County Coroner and autopsies will be charged on individual basis").]  Specifically, Dr. Kohr advised the Council's Budget Committee that the Coroner's budget would need to increase its budget line item for autopsies from $50,000 to $100,000 to account for the fact that Dr. Kohr would no longer be performing autopsies without charging an additional fee.  [Filing No. 35-9 at 2.]

The Budget Committee increased the budget line item for the Coroner's office to $100,000, which ended up being a fairly reliable estimate for 2013 going forward.  [Filing No. 35-1 at 11-14.]  Actual expenditures for autopsies in Vigo County were $46,660 in 2010, $46,180 in 2011, $31,600 in 2012, $115,100 in 2013, $131,676 in 2014, $120,525 in 2015, and $166,565 through October 2016.  [Filing No. 35-11 at 2.]

#### 2.  Adjustments to Make Salary Comparable to Other Coroners

In November 2011, Kathy Miller, a Council member, contacted then-Council Administrator Ryan Oilar to gather data related to the salaries other comparably sized Indiana counties were paying their elected officials.  [Filing No. 35-2 at 6; Filing No. 35-10 at 2.]  Ms. Miller made that request because the Council was "looking at a large loss in the coming year as far as property tax

caps losses and [was] looking at additional ways of reducing funding and comparing our elected officials with other elected officials across the state in like counties to see where [Vigo County] fell in the mix." [Filing No. 35-2 at 6.]

Using the Association of Indiana Counties Fact Book, Mr. Oilar researched salaries for elected officials in counties with populations between 100,000 and 150,000. [Filing No. 35-10 at 2.] His research revealed that Vigo County was paying its Commissioner, Court Reporter, and Coroner a "notably higher" salary than the average for similarly sized counties. [Filing No. 35-10 at 2-3.]

### 3. Property Tax Cap

When determining the salaries for Vigo County public officials, the Council also considered the fact that property tax caps had been enacted which decreased anticipated revenue for the County by $2 million to $3 million. [Filing No. 35-2 at 17-18.] The loss in revenue from the property tax cap "was enough to make [the Council] look into every avenue of making adjustments." [Filing No. 35-2 at 18.]

### 4. The Council's Decision Regarding the Coroner's Salary

In recommending the budget for the Coroner's office for 2013, the Council's Annual Budget Committee considered the following factors: (1) the costs associated with autopsies, since Dr. Kohr would no longer be performing them free of additional charge; (2) the fact that the Vigo County Coroner was being paid nearly twice as much as coroners in other counties with comparable populations; (3) the overall revenue for the County, given that the recent property tax cap had been enacted so property tax income was estimated to be less than previous years; and (4) a general request from the County that departments reduce budgets to the extent possible to account for a general wage increase for employees for the first time in two years. [Filing No. 35-9 at 2-3.]

Mr. Oilar participated in discussions regarding the Coroner's salary, and provided his research regarding the coroner salary in comparably sized counties including Clark, Delaware, Hendricks, Johnson, LaPorte, and Monroe counties.  [Filing No. 35-10 at 3.]  Mr. Oilar also participated in calculating the 2012 Coroner's compensation rate to reflect that Dr. Kohr was conducting autopsies.  [Filing No. 35-10 at 3.]  This calculation factored in Indiana statutes requiring certain baseline salaries and enhancements for providing certain services, and resulted in a base salary which would be multiplied by 1.5 if the Coroner is a licensed physician, then multiplied by 1.5 again if the Coroner is qualified as a pathologist and has agreed to perform autopsies without an additional charge to Vigo County.  [Filing No. 35-10 at 3.]  If the base salary was multiplied by 1.5 twice to account for the Coroner being a licensed physician and a pathologist who would perform autopsies without an additional charge, the resulting salary would equal the salaries of other elected officials in Vigo County.  [Filing No. 35-10 at 3.]  During these discussions, the gender of the Coroner was never discussed in Mr. Oilar's presence.  [Filing No. 35-10 at 3.]

On September 11, 2012 – before Dr. Amos ran for her second stint as Coroner – the Council adopted an Elected Official Salary Ordinance by unanimous vote, which established a base salary of $21,270 for the Coroner and provided for the 1.5 multiples for being a licensed physician and also for being a licensed pathologist who performed autopsies for the County without charging an additional fee.  [Filing No. 35-12 at 7.]  According to this formula, a Coroner who is also a licensed physician would earn a salary of $31,905, and a Coroner who is also a licensed physician and a licensed pathologist who performs autopsies for the County without charging an additional fee would earn a salary of $47,857.50.  [Filing No. 35-12 at 7.]  The County Auditor, Clerk, Recorder, Surveyor, and Treasurer all earn salaries of $47,858.  [Filing No. 35-12 at 7.]  Dr. Kohr would essentially earn that amount ($47,857.50) if he were to return as Coroner since he is both a licensed

physician and a licensed pathologist who would perform autopsies without charging an additional fee, but Dr. Amos earned a lesser salary of $31,905 since she is not a licensed pathologist. [Filing No. 35-12 at 7.]

### F.  Dr. Amos' Second Stint as Coroner and Her Requests for a Salary Increase

Dr. Amos was elected Coroner again in 2012, and took office in January 2013. [Filing No. 41-16 at 3.] Dr. Amos is a full-time family practice physician in Terre Haute, Indiana, owns her own private medical practice, treats approximately twenty patients a day who range in age from newborns to the elderly, and provides approximately twelve hours of hospital call coverage per week. [Filing No. 35-1 at 4-5.] She is also a certified medical-legal death investigator, and has maintained her certification continuously since 2010. [Filing No. 41-17 at 8-10.]

The Coroner position is essentially a part-time position that does not require Dr. Amos to be regularly present at Vigo County offices – although Dr. Amos is on call at all hours, seven days a week, as Coroner and personally reports to the scene of homicides and sometimes to the scene of suspicious deaths. [Filing No. 41-17 at 4-6.] Dr. Amos communicates with Donna Weger, the Coroner's Office Assistant, primarily via telephone and does so multiple times a day. [Filing No. 41-17 at 7.] She estimates that she spends seven to twenty hours a week on Coroner duties. [Filing No. 41-17 at 6.] Dr. Amos' duties as Coroner include completing death certificates, visiting the scenes of homicides, suicides, or accidents resulting in deaths, and communicating with family members, pathologists, and media. [Filing No. 41-17 at 4-5.] Dr. Amos' duties as Coroner have, at times, interrupted her patient care at her private practice. [Filing No. 35-1 at 9.]

In certain situations, the Coroner must order an autopsy in connection with a death investigation, including when someone dies unexpectedly with no medical history, when a handgun is involved, when there is an apparent suicide, and when there is an accidental death or a death of an

infant or child.  [Filing No. 41-17 at 13.]  Dr. Kohr continues to perform the majority of autopsies for Vigo County, and Dr. Amos has a very good working relationship with him.  [Filing No. 41-17 at 14.]

When Dr. Amos took office in January 2013, she learned that the Coroner's salary was lower than other elected officials and notified the Council President, Kathy Chalos-Miller, of her demand to have her salary set at the same level of other officeholders.  [Filing No. 41-4 at 2 (January 4, 2013 letter from Dr. Amos to Ms. Chalos-Miller stating "I feel that this is an unacceptable salary based on my qualifications, being a physician and a certified medical death investigator, as well as serving two terms as a previous Coroner for Vigo County").]  Dr. Amos also wrote a January 11, 2013 letter to the County Auditor regarding the salary change.  [Filing No. 41-17 at 32-33.]  An attorney who advises the Council responded to Dr. Amos' January 11, 2013 letter by setting out the Salary Ordinance.  [Filing No. 41-17 at 33.]

On February 21, 2013, Dr. Amos requested that her salary be increased at a Personnel Committee Meeting, and the Committee voted to move the request to the full Council for further discussion.  [See Filing No. 41-5 at 2.]  At the meeting, Dr. Amos voiced her belief that she was being discriminated against based on her gender.  [Filing No. 41-5 at 3.]  Dr. Amos attended the full Council meeting on March 12, 2013, requested that her salary be increased, and stated that "over the past eight years, Dr. Kohr was paid at the rate of the majority of other elected officials including the County Assessor, Auditor, Clerk, Recorder, Surveyor and Treasurer," and that she believed "Dr. Kohr's salary was a straight salary and there was no mention of a stipend being a part of his salary for his ability to perform autopsies."  [Filing No. 41-6 at 6.]  Dr. Amos also stated that she "feels that the only difference between her and Dr. Kohr is that she is female and she is

being discriminated against." [Filing No. 41-6 at 6.] The Council voted to deny Dr. Amos' request to increase the Coroner's salary at the meeting. [Filing No. 41-6 at 6.]

In September 2013, the Council passed its Elected Official Salary Ordinance for 2014. [Filing No. 41-7 at 2.] The Ordinance reflected a small raise from the previous year for all elected officials, but the salaries were otherwise unchanged – including the formula for calculating the Coroner's salary. [Filing No. 41-7 at 2.] On December 31, 2013, Dr. Amos wrote to the Vigo County Auditor to request that her salary for 2014 be increased. [Filing No. 41-17 at 35.] At a February 11, 2014 Council meeting, the Council voted to deny Dr. Amos' request for a salary increase, claiming that it could not change the compensation of an elected official during the year based on an Indiana statute. [Filing No. 41-8 at 4.] Dr. Amos was not informed before the meeting that an Indiana statute prohibited the Council from changing her salary during the year. [Filing No. 41-20 at 6.]

In September 2014, the Council passed the Elected Official Salary Ordinance for 2015, which left the salaries for elected officials essentially unchanged (except for small increases), including the formula for calculating the Coroner's salary. [Filing No. 41-10 at 2; Filing No. 41-18 at 20-21.] Dr. Amos wrote a letter to the County Auditor on December 30, 2014, again relating to her salary. [Filing No. 41-17 at 38.] The Council declined to hear Dr. Amos' request to increase her salary, citing a Council Rule that precluded it from doing so because the Council had moved to deny Dr. Amos' salary increase request within the past twelve months. [Filing No. 41-11 at 2.] In August 2015, Dr. Amos spoke at a Council meeting during a time that was set aside to give elected officials an opportunity to speak to the Council. [Filing No. 41-12 at 2.] Dr. Amos stated that she "feels she was specifically targeted for a salary decrease," that "[o]ther County office

holders are not paid based on their educational background," and that "[s]he feels this is discrimination and is trying to avoid a lawsuit." [Filing No. 41-12 at 2.] Although Dr. Amos thought that there would be some dialogue with the Council and that some action would be taken on her request, neither took place. [Filing No. 41-17 at 39-40.]

Dr. Amos attended a Budget Committee Appeal meeting on September 16, 2015, where she requested that the Coroner's salary be increased to the same amount as the County Assessor, Auditor, Clerk, Recorder, Surveyor, and Treasurer, and that the increase be made retroactive to January 2013. [Filing No. 41-17 at 42.] The Budget Committee referred Dr. Amos' request to the full Council for consideration at its October 13, 2015 meeting. [Filing No. 41-17 at 42.] A few hours before the October 13, 2015 Council meeting, Dr. Amos received a document via facsimile that was titled "Amended Salary Ordinance" and that brought the Coroner's salary up to the salary of other Vigo County elected officials. [Filing No. 41-17 at 44.] Dr. Amos believed that this meant the Council was going to pass the Ordinance. [Filing No. 41-17 at 44.] At the meeting, however, no one looked at or spoke to Dr. Amos and none of the Council members moved to vote on the proposed Amended Salary Ordinance. [Filing No. 41-17 at 44-45.] Council members looked at each other and snickered, and Dr. Amos felt like she had been set up to be laughed at. [Filing No. 41-17 at 45.] Ms. Weger, who was also present at Council meetings where Dr. Amos requested that her salary be increased, felt the Council treated Dr. Amos rudely and noticed that Council members were snickering and smirking at Dr. Amos. [Filing No. 41-16 at 4.]

In November 2015 and September 2016, the Council passed Elected Official Salary Ordinances for 2016 and 2017 respectively, both of which again left salaries unchanged except for a small percentage increase across the board. [Filing No. 41-14; Filing No. 41-18 at 26-27.] The Coroner's salary still provided for multipliers for being a licensed physician and also for being a

licensed pathologist who performed autopsies at no additional charge.  [Filing No. 41-14; Filing No. 41-18 at 26-27.]

### G.  The Lawsuit

Dr. Amos initiated this litigation on December 17, 2015.  [Filing No. 1.]  In her Complaint, Dr. Amos asserts a claim under 42 U.S.C. § 1983 for violation of the Equal Protection Clause of the Fourteenth Amendment.  [Filing No. 1 at 5-6.]  Specifically, Dr. Amos alleges that Defendants acted under color of state law by passing salary ordinances for elected officials and paying her salary, that she is a member of a "quasi-suspect class" (female), that the 2013 through 2016 Elected Official Salary Ordinances discriminate against her on the basis of her gender and are unconstitutional under the Equal Protection Clause of the Fourteenth Amendment, and that Defendants intentionally discriminated against her on the basis of her gender by paying her less than her male predecessor and/or similarly situated male elected officials of Vigo County.  [Filing No. 1 at 5.]  Dr. Amos seeks compensatory damages, lost wages, liquidated and/or punitive damages, interest, and attorneys' fees and costs.  [Filing No. 1 at 6.]

Defendants filed their Motion for Summary Judgment on November 15, 2016, [Filing No. 35], and the motion is now ripe for the Court's decision.

### III.
### DISCUSSION

In support of their Motion for Summary Judgment, Defendants argue that beyond alleging a prima facie case of gender discrimination, Dr. Amos has not presented any evidence that the Coroner's salary was lowered because she is a female.  [Filing No. 36 at 16.]  Defendants note that the analysis of the Coroner's salary compared to salaries in comparably sized counties was under way in 2011, before Dr. Amos even sought the Coroner position.  [Filing No. 36 at 16.]  They argue that Mr. Oilar's research revealed that Vigo County was paying its Coroner substantially

more than other counties, and that the Coroner salary for Dr. Kohr also compensated him for performing autopsies free of any additional charge.  [Filing No. 36 at 16-17.]  Defendants assert that "county outlays for autopsies rose from $31,600 in 2012 (Dr. Kohr's last year in office) to $115,100 in 2013 (Dr. Amos' first year in office)," and that "[t]hose expenses have exceeded the budgeted line item of $100,000 every year since Dr. Amos took office and after 10 months of 2016 exceed $166,000 for the current year."  [Filing No. 36 at 17 (emphasis omitted).]  Defendants outline evidence indicating that Dr. Kohr's retirement would result in higher costs to the County, and that this was a factor in setting the Coroner's salary for 2013 and thereafter.  [Filing No. 36 at 17-19.]  Defendants also present data for other comparably-sized counties which shows that the Vigo County Coroner salary is now in line with those counties.  [Filing No. 36 at 19-20.]  Finally, Defendants contend that Dr. Amos concedes that other female officeholders in Vigo County are paid the same salary as their peers, including the County Commissioner, the County Assessor, and the County Recorder, which "casts doubt on Dr. Amos' capacity to demonstrate even a *prima facie* case of gender discrimination to this Court."  [Filing No. 36 at 20.]

In response, Dr. Amos argues that she and Dr. Kohr are similarly situated because they have held the same elected office and have "essentially taken turns serving as Vigo County Coroner for eight years at a time."  [Filing No. 41 at 15.]  While she acknowledges that Dr. Kohr performs autopsies and she does not, Dr. Amos argues that this is irrelevant because coroners are not required to perform autopsies themselves, and rarely do.  [Filing No. 41 at 16.]  Dr. Amos contends that Dr. Kohr essentially held two separate roles – coroner and autopsy performer – and that the County "conflated these two roles."  [Filing No. 41 at 17.]  Dr. Amos argues that she performs the same duties and has the same responsibilities as Dr. Kohr, so they are similarly situated.  [Filing No. 41 at 17-18.]  She contends that Defendants have not "articulated any basis for

- 14 -

the difference in treatment between [her] and Dr. Kohr which relies on her job performance," and that coroners are not required to even be physicians, much less pathologists. [Filing No. 41 at 18-19.] Dr. Amos argues that Dr. Kohr's salary as Coroner did not include a stipend for performing autopsies, and that this stipend was created after the fact to justify lowering Dr. Amos' salary. [Filing No. 41 at 19.] She claims that she and Dr. Kohr had been treated equally in the past. [Filing No. 41 at 19.] Dr. Amos notes that the property tax cap cannot have been the reason for reducing her salary because the cap took effect in 2010 and the County did nothing to reduce the salaries of other elected officials, either in the 2013 Elected Official Salary Ordinance or in subsequent years. [Filing No. 41 at 20.] She argues that the difference between her salary and Dr. Kohr's was approximately $15,000 to $16,000, and that the Council consistently approved appropriations for funding in other departments that would have exceeded that amount. [Filing No. 41 at 20-21.] Dr. Amos asserts that the salaries of coroners in other counties is irrelevant, and that "[e]ven if Vigo County has not discriminated against other female elected officials, that matters not for Dr. Amos' individual gender discrimination claims" because she is not alleging that Vigo County is discriminating against females "in general across the board." [Filing No. 41 at 21-22.] Finally, Dr. Amos notes that she gave the Council multiple opportunities to address her salary complaint, and that she "felt like the Council made her a laughingstock after no motion was taken on her request, and members of the Council started snickering." [Filing No. 41 at 22.]

On reply, Defendants argue that it is Dr. Amos' burden to establish discriminatory animus, and she has not done so. [Filing No. 44 at 2-3.] They argue that Dr. Amos has not presented evidence that "the assumed inevitability of Dr. Amos' election to office" had anything to do with establishment of the Coroner's salary. [Filing No. 44 at 3.] Defendants also note that the Coroner's salary is fixed for the position, not the individual, so that her successor would earn the same

amount.  [Filing No. 44 at 3.]  They reiterate that research regarding the appropriate amount of the

Coroner's salary began in November 2011, before Dr. Kohr advised the Council of any budgetary

consequences of his retirement and before Dr. Amos had declared her candidacy for the position.

[Filing No. 44 at 4.]  Defendants contend that any conversations Ms. Weger had with Council

members do not show discriminatory animus.  [Filing No. 44 at 4-5.]  They argue that Dr. Amos

ignores key differences between her qualifications and those of Dr. Kohr, and that it is irrelevant

that Dr. Kohr was not required to perform autopsies – he did, so when he ceased to do so, budgetary

adjustments had to be made.  [Filing No. 44 at 6-7.]  Defendants emphasize their justifications for

establishing the Coroner's salary – none of which relate to the Coroner's gender.  [Filing No. 44

at 8-10.]  As to Dr. Amos' claim that the Council snickered at her when it did not adopt a resolution

increasing her salary, Defendants argue that even if this showed "disrespect," it is not proper to

"convert that moment into an inference of gender-based animus, especially in the absence of any

evidence of gender discrimination otherwise…."  [Filing No. 44 at 11-12 (emphasis omitted).]

### A.  Applicable Law

42 U.S.C. § 1983 provides that "[e]very person who, under color of any…State…subjects,

or causes to be subjected, any citizen of the United States…to the deprivation of any rights, privi-

leges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an

action at law…."  To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that she was: (1)

deprived of a federal right, privilege, or immunity; (2) by any person acting under color of state

law.  *Brown v. Budz*, 398 F.3d 904, 908 (7th Cir. 2005).  "It is well-established that a plaintiff only

may bring a § 1983 claim against those individuals personally responsible for the constitutional

deprivation."  *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 614 (7th Cir. 2002).  "[T]he

first step in [analyzing] any [1983] claim is to identify the specific constitutional right allegedly

infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). Here, Dr. Amos alleges that her right to Equal Protection under the Fourteenth Amendment has been violated because Defendants discriminated against her based on her gender.

Gender discrimination claims arising under the Equal Protection Clause and Section 1983 are generally evaluated under substantially the same framework as Title VII claims. *Swearnigen-El v. Cook County Sheriff's Dept.*, 602 F.3d 852, 860 n.6 (7th Cir. 2010) ("The same requirements for proving discrimination apply to claims under Title VII, § 1981, and § 1983"). A plaintiff can prove gender discrimination claims under either the direct or indirect method of proof. *Liu v. Cook County*, 817 F.3d 307, 315 (7th Cir. 2016). The Seventh Circuit recently instructed that, under the direct method, courts should consider "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'" *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).[3]

---

[3] *Ortiz* disapproved of prior efforts on the part of district courts to "shoehorn all evidence into two 'methods,' and [their] insistence that either method be implemented by looking for a 'convincing mosaic,'" because that approach "detracted attention from the sole question that matters: Whether a reasonable juror could conclude that [plaintiff] would have kept his job if he [was not a member of a protected class] and everything else had remained the same…." This Court reads *Ortiz* as a shift from treating "direct" and "indirect" evidence differently, and not as creating a standard different from the two-option test whereby a plaintiff can either prove discrimination by the "direct method," or the "indirect burden-shifting method" set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ortiz*, 834 F.3d at 766 ("Today's decision does not concern *McDonnell Douglas* or any other burden-shifting framework, no matter what it is called as a shorthand. We

Under the indirect method, a plaintiff can rely on the *McDonnell Douglas* burden-shifting method of proof. *Antonetti*, 563 F.3d at 591 (referencing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). To establish a prima facie case of gender discrimination, a plaintiff must show that: "(1) she is a member of a protected class; (2) she was meeting her employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly-situated male employees." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002).

Once a plaintiff establishes a prima facie case, the burden "then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its [actions]. If the employer satisfied its burden, the burden shifts back to the plaintiff to prove that the proffered reason was pretextual." *Walker v. Glickman*, 241 F.3d 884, 889 (7th Cir. 2001) (citation omitted). Pretext is defined as "a dishonest explanation, a lie rather than an oddity or an error." *Sweatt v. Union Pacific R. Co.*, 796 F.3d 701, 709 (7th Cir. 2015) (citing *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002)). To establish pretext, the plaintiff must show either that the employer was motivated by a discriminatory reason or that the proffered reason is "unworthy of credence." *Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 675-76 (7th Cir. 2003). "A plaintiff may accomplish this showing with evidence tending to prove that the employer's proffered reasons are factually

---

are instead concerned about the proposition that evidence must be sorted into different piles, labeled 'direct' and 'indirect,' that are evaluated differently. Instead, all evidence belongs in a single pile and must be evaluated as a whole"); *David v. Board of Trustees of Community College District No. 508*, 2017 WL 129114, *4 (7th Cir. 2017) ("*Ortiz*, however, did not alter '[t]he burden-shifting framework created by *McDonnell Douglas*....' As we have explained, both before and after *Ortiz*, *McDonnell Douglas* is a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases").

baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge." *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 289 (7th Cir. 1999) (quoting *Testerman v. EDS Technical Prods. Corp.*, 98 F.3d 297, 303 (7th Cir. 1996)). "[I]n determining whether an employer's proffered reason for an employment action was pretextual, we are not concerned with the correctness or desirability of reasons offered for employment decisions, but rather the issue of whether the employer honestly believes in the reasons it offers." *Grayson v. O'Neill*, 308 F.3d 808, 820 (7th Cir. 2002); *see also Baron v. City of Highland Park*, 195 F.3d 333, 341 (7th Cir. 1999) ("[T]he overall correctness or desirability of the reasons proferred is not relevant to the determination of pretext…. Despite the plaintiff's contentions to the contrary, there is no evidence in the record to demonstrate that any of these reasons…are fallacious"). "[W]hen the sincerity of an employer's asserted reasons for discharging an employee is cast into doubt, a factfinder may reasonably infer that unlawful discrimination was the true motivation." *Stalter*, 195 F.3d at 289 (citation and quotation omitted).

The Court finds it most prudent to assume without deciding that Dr. Amos demonstrated a prima facie case of discrimination (including that she is similarly situated to Dr. Kohr), and focus solely on the question of pretext. *See Bodenstab v. Cnty. Of Cook*, 569 F.3d 651, 657 (7th Cir. 2009) ("While the question of pretext arises only after a plaintiff has established a prima facie case of discrimination and the employer has countered with a legitimate non-discriminatory reason for the adverse action, we can skip over the initial burden-shifting of the indirect method and focus on the question of pretext"); *Rummery v. Illinois Bell Tel. Co.*, 250 F.3d 553, 556 (7th Cir. 2001) ("Like the district court, we will assume, without deciding, that [the plaintiff] established a prima facie case of discrimination").

### B.  Pretext Analysis

Defendants have set forth several reasons for reducing the Coroner's salary after Dr. Kohr left office:  (1) to account for the fact that Dr. Kohr performed autopsies without charging an additional fee, Dr. Kohr's successor would not do so, and the budget for autopsies had to be increased accordingly; (2) Vigo County was paying its Coroner significantly more than other comparably-sized counties paid their coroners; and (3) the property tax cap had reduced revenues for the County.  In response, Dr. Amos has not presented any evidence indicating that these reasons were pretextual.  First, it is undisputed that when Dr. Kohr served as Coroner, he performed autopsies for Vigo County without charging any fee.  It is also undisputed that the Council found that it needed to increase the budget for the performance of autopsies after Dr. Kohr left, since he would no longer be performing them free of charge.  Dr. Amos argues that these reasons are irrelevant because Dr. Kohr did not deserve more pay since he performed autopsies, and because his performance of autopsies free of charge was not a consideration when Dr. Kohr's Coroner salary was set – the "stipend" for performing autopsies was only created in the 2013 budget.  [Filing No. 41 at 19.]  She also notes that she and Dr. Kohr were treated equally in the past – that the Coroner's salary had always been the same as other Vigo County officials prior to 2013, including when she replaced Dr. Kohr in 1997 and when Dr. Kohr replaced her in 2005.  [Filing No. 41 at 19.]  But the fact that Dr. Kohr performed autopsies was undisputedly worth a great deal to Vigo County – indeed, the County's costs for autopsies in 2012, when Dr. Kohr was Coroner, were $31,600, and those costs increased to $115,100 in 2013, the year that Dr. Amos took office.  [Filing No. 35-11 at 2.]  Dr. Kohr's performance of autopsies arguably made him deserving of a higher salary than Dr. Amos, and the fact that the performance of autopsies is not a requirement for the Coroner is of no moment.

Additionally, even though Dr. Amos and Dr. Kohr had received the same Coroner salary in the past, Dr. Amos ignores other factors that led to Defendants' decision to lower the salary for the position.  For example, the County had determined that it was paying significantly more to its Coroner than comparably-sized counties.  Dr. Amos argues that this is irrelevant, but she does not present any evidence that it did not legitimately factor into Defendants' decision.  This she must do in order to show that the reason was pretextual.

Further, Defendants considered the property tax cap in lowering the Coroner salary.  Dr. Amos argues that the property tax cap went into effect in 2010, yet the County "did nothing to reduce the salaries of any other elected officials…," and that only she has been "singled out for a reduction."[4]  [Filing No. 41 at 20.]  Defendants explain, however, that the other elected positions such as the Commissioner are considered full-time, whereas the Coroner position is considered part-time.  The evidence supports this reasoning.  [*See* Filing No. 35-1 at 4-8 (Dr. Amos testifying that she is a full-time family practice physician, owns her own private medical practice, treats approximately twenty patients a day who range in age from newborns to the elderly, provides approximately twelve hours of hospital call coverage per week, and spends seven to twenty hours per week on Coroner duties).]  Dr. Amos refers vaguely to other appropriations the Council approved that were more than the additional $15,000 to $16,000 a year she sought as a salary increase, but does not provide any information indicating that those appropriations were not necessary or justified.  The Court will not second-guess financial decisions made by the Council regarding other appropriations, and the fact that the Council approved appropriations that were larger

---

[4] Significantly, several elected officials who served in positions where the salary was not reduced (including the Commissioner, Recorder, Assessor, and a Councilwoman) were female.  [Filing No. 35-1 at 19; Filing No. 35-2 at 7; Filing No. 41-17 at 30.]

than the amount Dr. Amos sought does nothing to show that the Council's reasons for reducing the salary were pretextual.

Finally, Dr. Amos relies on her own testimony and the testimony of Dr. Weger indicating that Council members "made her a laughingstock," embarrassed her, treated her rudely, did not seriously consider her request and snickered at her.  [*See, e.g.*, Filing No. 41 at 22.]  It is well-settled that the law does not guarantee a "happy workplace."  *See, e.g.*, *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002).  To the extent that Dr. Amos relies upon this treatment at Council meetings to demonstrate that Defendants' reasons for reducing the Coroner's salary were pretextual, it is unavailing.  It does not indicate whether Defendants sincerely believed in the reasons for reducing the Coroner's salary – that Dr. Kohr would no longer be performing autopsies free of charge, that other comparably sized counties were paying their coroners significantly less, and that the 2010 property tax cap had decreased County revenue.

In sum, because Defendants have presented legitimate, non-discriminatory reasons for lowering the Coroner salary, and since Dr. Amos has not presented any evidence that Defendants' stated reasons for decreasing the Coroner salary were pretextual, Defendants are entitled to summary judgment on Dr. Amos' claim.  The Court will not second-guess Defendants' decision, absent any evidence whatsoever that Defendants did not believe those reasons were legitimate.  *See O-Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 984 (7th Cir. 2001) ("[W]e 'do not sit as a kind of 'super-personnel department' weighing the prudence of employment decisions made by firms charged with employment discrimination'… 'On the issue of pretext, our only concern is the honesty of the employer's explanation.'…  And there is no indication in the record that [the employer] did not honestly believe [its actions were correct]") (citation omitted); *see also Pitasi v. Gartner Group, Inc.*, 184 F.3d 709, 718 (7th Cir. 1999) (in order to show pretext, it is insufficient for

employee "to show that his employer [acted] for incorrect or poorly considered reasons.  He must establish that the employer did not honestly believe the reasons it gave for [its actions]"); *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006) (finding insufficient evidence of pretext and stating "it is not our role to determine the competency of or interfere in employment decisions simply where we believe an employer has made a poor choice.  Federal courts have authority to correct an adverse employment action only where the employer's decision is unlawful, and not merely when the adverse action is unwise or even unfair").  Additionally, glaringly absent is any evidence showing Defendants' actions were motivated by the fact that Dr. Amos is a female.  [*See also* Filing No. 35-1 at 15-17 (Dr. Amos testifying that she is not aware of any documentation indicating that the Coroner salary decision was based on her gender, that she is not aware of any witnesses or individuals who would support her "core contention that the salary was fixed at a lower level because of [her] gender," and that her only support for her gender discrimination claim is "third or fourth hand" rumors).]

Even assuming Dr. Amos could have presented a prima facie case of gender discrimination, she has not presented any evidence demonstrating that Defendants' reasons for lowering the Coroner salary were pretextual.  Accordingly, her gender discrimination claim fails as a matter of law, and Defendants are entitled to summary judgment.

## IV.
### CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment, [Filing No. 35], is **GRANTED**.  Final judgment shall enter accordingly.


Date:  March 8, 2017

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

- 23 -

**<u>Distribution via ECF only to all counsel of record</u>**